All 93579 contracts are 50% owned

Notes

STOCK PURCHASE AGREEMENT

dated as of December 9, 2005

by and among

ARTIST HOUSE HOLDINGS, INC.

and

HABSBURG HOLDINGS LTD. and
OSVALDO PATRIZZI;

# STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT ("Agreement") is effective as of the 9th day of December, 2005 by and among **ARTIST HOUSE HOLDINGS, INC. ("AHA")**, a corporation with its principal place of business located at Aoyama Building 3F, 1-1-8 Shibuya, Shibuya-ku, Tokyo, Japan; **HABSBURG HOLDINGS LTD. ("Habsburg")**, a British Virgin Island corporation with its principal place of business located at Skelton Building, P.O. Box 3136, Road Town, Tortola, BVI; and **OSVALDO PATRIZZI ("Patrizzi")**, an individual residing at 16 bis rue Bel Respiro, Monte-Carlo, 98000, Principauti de Monaco (Habsburg and Patrizzi are hereinafter collectively referred to as the "Stockholders").

## R E C I T A L S :

A.   The Stockholders own all of the issued and outstanding shares of the capital stock of (i) Antiquorum, S.A ("ASA"), a Swiss corporation with its principal place of business located at 2, rue du Mont-Blanc, 1211 Geneva, Switzerland; (ii) Antiquorum USA, Inc. ("AUSA"), a Delaware corporation with its principal place of business located at 609 Fifth Avenue, Suite 530, New York, New York 10017; (iii) C2C Time, Inc., a New York corporation with its principal place of business located at 609 Fifth Avenue, Suite 530, New York, New York 10017 ("C2C"), and (iv) Antiquorum Auctioneers (Hong Kong) Ltd. ("AHK"), a subsidiary of ASA, and will hereafter form a new company in Japan ("AJAP") [ASA, AUSA, C2C, AHK and AJAP are hereinafter collectively referred to as the "Company"].

B.   Some of the parties hereto have heretofore entered into a Letter of Intent providing for the purchase by AHA of the assets of ASA and its affiliates upon certain terms and conditions.

C.   AHA desires to purchase all of the issued and outstanding shares of stock of the Company owned by the Stockholders, and the Stockholders desire to sell such shares to AHA for the purchase price set forth in the Letter of Intent and upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and of the mutual agreements, representations, warranties, provisions and covenants herein contained, the parties hereto hereby agree as follows:

1.   PURCHASE AND SALE OF SHARES; CLOSING

1.1   <u>Purchase and Sale.</u>   On the Closing Date referred to in Section 1.2 hereof, AHA agrees to purchase from the Stockholders, and the Stockholders agree to sell, assign, transfer and deliver to AHA, free and clear of all claims, liens and encumbrances, fifty percent (50%) of stock of the Company owned by the Stockholders (the "Company Shares").   On the

1

Closing Date, the Stockholders shall deliver all stock certificates in their possession evidencing such stock ownership, together with valid stock powers transferring the shares to AHA, to the Escrow Agent, or the Transfer Agent, as the context may require, pursuant to the terms of Section 13 of this Agreement.

1.2     **Closing**.   The closing of the transactions contemplated by this Agreement (the "Closing") shall take place on or before the 31st day of December, 2005, time being of the essence.

1.3     **Formation of Antiquorum Japan**.   Subsequent to the Closing, the parties shall form AJAP, a new entity bearing the Antiquorum name in Japan.   The stock of such entity shall be owned fifty percent (50%) by AHA and fifty percent (50%) by Patrizzi or his designee.

2.     PURCHASE PRICE

2.1     **Purchase Price**.   The purchase price (the "Purchase Price") for the Company Shares shall be Sixty-One Million Five Hundred Thousand Swiss Francs (CHF 61,500,000), less a credit for Eight Million Nine Hundred Thousand Swiss Francs (CHF 8,900,000) for assumed existing obligations..   As addition consideration for the conveyance of the Company Shares, AHA shall provide or arrange for, on or prior to March 13, 2006, a line of credit for the Company, for use it its ongoing business operations, in the amount of US $10,000,000.   In the even of any default by AHA in timely making any of the payments required hereunder, the Stockholders may (but shall not be required to), in addition to any other remedy, declare this Agreement to be terminated and of no further legal force and effect, in which event the parties shall have no further obligations to each other pursuant to this Agreement.

2.2     **Manner of Payment**.   The Purchase Price shall be paid as follows:

a)     Within forty-eight (48) hours of the execution and delivery of this Agreement, AHA shall deliver to Stockholders, by way of certified check or wire transfer to the Escrow Agent, the sum of One Million,  U.S. Dollars ($1,000,000.00); and

b)     On or before the Closing Date, AHA shall deliver to the Stockholders, by way of certified check or wire transfer to the Escrow Agent, the sum of Ten Million U.S. Dollars ($10,000,000.00);

c)     On or before January 15, 2006, AHA shall deliver to the Stockholders, by way of certified check or wire transfer to the Escrow Agent, the sum of Nineteen Million ($19,000,000.00) [this amount includes the sum of Two Million, Five Hundred Eighty Eight Thousand, Eight Hundred Swiss Francs (CHF 2,588,800) to use for the payment of prior, current and future operating expenses of ASA] in two installments, as follows: (i) the sum of US $4.5 million shall be paid on or before January 16, 2006, and (ii) the sum of US $14.5 shall be paid on or before January 23, 2006.;

2

e)    On or prior to the March 13, 2006, AHA shall provide, or arrange for, a line of credit for the Company, for the use by all Antiquorum entities (including, but not limited to, AUSA, ASA and AJAP) in the amount of Ten Million Dollars (US $10,000,000); and

2.3    **Retention of Cash-On-Hand, Publicly Traded Securities, and Receivables.** Any (i) cash owned by the Company as of the Closing Date, as reflected in its bank statement (the "Closing Date Cash"), (ii) any securities owned by the Company as of the Closing Date, and (iii) the total amount, if any, of the Company's accounts receivable accrued as of the Closing Date (the "Closing Date Receivable") shall remain the property of the Company and used by the Company in its continuing business operations. Any liabilities existing as of the Closing Date shall be the sole responsibility of the Company and shall be timely paid by the Company. It is the intention of the parties that any receivables and liabilities attributable to any operations of the Company prior to the Closing Date shall remain, respectively, the property and obligation of the Company.

2.4. Simultaneously with the execution of this Agreement, and in order to pay the book value of inventory on hand and owned by the Company to the Stockholders, ASA will execute a promissory note to a third party which will obligate ASA to pay to the third-party the sum of Sixteen Million Swiss Francs (CHF 16,000,000), together with interest thereupon at the Prime Rate as established by the Chase Manhattan Bank, within six months from the date thereof. Alternatively, Patrizzi may become personally responsible for payment of the said CHF 16,000,000 to any Stockholder which is entitled thereto. The parties hereto understand and agree that the said sum of CHF 16,000,000 shall be paid from the sale of inventory on hand and owned by the Company as of the date of this Agreement. Patrizzi shall ensure that the said inventory is offered for sale, either at auction or privately, prior to the due date of the said promissory note. Any funds received in excess of the said CHF 16,000,000 shall be the exclusive property of Patrizzi or his designees.

3.    **REPRESENTATIONS AND WARRANTIES OF STOCKHOLDERS**

Habsburg Holdings Ltd. and Osvaldo Patrizzi, each, jointly and severally, represent and warrant that all of the following representations and warranties set forth in this Section 3 are true at the date of this Agreement and shall be true at the time of Closing. For purposes of this Agreement, the term "Material Adverse Effect" means, when used in reference to the Company, a material adverse effect on the business, operations, properties, assets or condition (financial or otherwise) of the Company and its subsidiaries taken as a whole. For purposes of this Section 3, the term "Company" shall mean and refer to the Company and all of its subsidiaries, if any.

3.1    **Due Organization.** The entities constituting the Company are all validly existing and in good standing under the laws of the jurisdiction in which they were formed, and have all requisite power and authority to carry on their businesses as they are now being

3

conducted. The entities constituting the Company are all duly qualified to do business and are in good standing in each jurisdiction in which the nature of their business or the ownership or leasing of their properties makes such qualification necessary, except where the failure to be so authorized or qualified would not have a Material Adverse Effect. True, complete and correct copies of any and all documents requested by AHA regarding the organization of the Company were reviewed by AHA and AHA has conducted whatever investigation it deemed necessary with respect thereto and accepts the same as is. Any stock records of the Company requested and reviewed by AHA are correct and complete in all material respects. There are no minutes in the possession of the Company or the Stockholders which have not been made available to AHA.

 3.2    **Authorization.** The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary parties.

 3.3    **Capital Stock of the Company.** The authorized capital stock of each of the entities constituting the Company are or were owned of record and beneficially by the Stockholders in the amounts set forth on Schedule 3.3 and the fifty percent (50%) of the shares to be delivered to AHA hereunder will be owned free and clear of all liens, security interests, pledges, charges, voting trusts, restrictions, encumbrances and claims of every kind on the Closing Date; provided, however, that the fifty percent (50%) of the Company's shares that are required to be delivered to AHA hereunder may be delivered to AHA directly by transferees of the same from Habsburg. All of the issued and outstanding shares of the capital stock of the Company have been duly authorized and validly issued, are fully paid and nonassessable, and were offered, issued, sold and delivered by the Company in compliance with all applicable laws concerning the issuance of securities. None of such shares were issued in violation of any preemptive rights or similar rights of any past or present stockholder of the Company. No option, warrant, call, conversion right or commitment of any kind exists which obligates the Company to issue any shares of its capital stock or obligates any of the Stockholders to transfer any shares of the Company Stock to any person except pursuant to this Agreement or in connection with any option agreement executed contemporaneously herewith.

 3.4    **Subsidiaries.** The Company has no subsidiaries or d/b/a names and has not conducted business under any other name except its legal name on its Certificate of Incorporation or formation documents, other than as set forth on Schedule 3.4. Except as set forth on Schedule 3.4, the Company does not own, of record or beneficially, or control, directly or indirectly, any capital stock, securities convertible into capital stock or any other equity interest in any corporation, association or other business entity, and the Company is not, directly or indirectly, a participant in any joint venture, partnership or other non-corporate entity.

 3.5    **Financial Statements.** Complete and correct copies of any financial statements requested by AHA were delivered by the Company to AHA and AHA has conducted whatever investigation it deemed necessary with respect thereto and accepts the same as is. All financial records of the Company have been maintained in conformity with generally accepted accounting principles ("GAAP") applied on a basis consistent with preceding years and throughout

4

the periods involved and present fairly the financial position and results of operations of the Company as of the dates of such records and for the periods covered thereby. The books of account of the Company have been kept accurately in all material respects in the ordinary course of business, the transactions entered therein represent *bona fide* transactions, and the revenues, expenses, assets and liabilities of the Company have been properly recorded therein in all material respects.

       3.6    **Liabilities and Obligations.** Except as and to the extent disclosed and adequately provided for in its books and records, or on the face of any financial statements, the Company has no liabilities or obligations of any kind, whether accrued, absolute, secured or unsecured, contingent or otherwise. Except and to the extent disclosed on its books and records, there are no claims, liabilities or obligations, nor, to the best knowledge of the Stockholders, any reasonable basis for assertion against the Company, of any claim, liability or obligation, of any nature whatsoever. Notwithstanding the foregoing provisions of this Section 3.6, additional payables and accruables will be incurred in the ordinary course of operating the business of the Company between the date of this Agreement and the Date of Closing.

       3.7    **Accounts and Notes Receivable.** The books and records of the Company accurately and fully set forth the accounts and notes receivable of the Company, as of the date of such records. All such accounts, notes and other receivables were incurred in the ordinary course of business, are stated in accordance with GAAP, and are collectible in the amounts shown on the books and records of the Company.

       3.8    **Permits and Intangibles.** The Company and its employees hold all licenses, franchises, permits and other governmental authorizations required in connection with the conduct of the Company's business. All licenses, franchises, permits and other governmental authorizations are valid, and the Company has not received any notice that any person intends to cancel, terminate or not renew any such license, franchise, permit or other governmental authorization. To the best knowledge of the Stockholders, the Company has conducted and is conducting its business in compliance with the requirements, standards, criteria and conditions set forth in any licenses, franchises, permits and other governmental authorizations and is not in violation of any of the foregoing. The transactions contemplated by this Agreement will not result in a default under or a breach or violation of, or adversely affect the rights and benefits afforded to the Company by, any such licenses, franchises, permits or government authorizations.

       3.9    **Personal Property.** The books and records of the Company set forth an accurate list of all personal property owned by the Company, and all leases and agreements in respect of personal property of the Company. True, correct and complete copies of all of documents requested by AHA in connection to such personal property have been delivered to AHA, and AHA has examined, is satisfied with, and accepts the same as is. All material personal property used by the Company in its business is either owned by the Company or leased by the Company, and, subject to ordinary repair and replacement, is reasonably adequate to operate the business of the Company as currently conducted. All leases and agreements for property used by the Company are in full force and effect and constitute valid and binding agreements of the parties (and their successors) thereto in accordance with their respective terms.

3.10   <u>Material Contracts and Commitments</u>. True, complete and correct copies of all material contracts, commitments and similar agreements to which the Company is a party or by which it or any of its properties are bound have been made available to AHA and AHA accepts the same as is. The Company has complied with all material commitments and obligations pertaining to it, and is not in default under any contracts or agreement and no notice of default under any such contract or agreement has been received.

3.11   <u>Real Property</u>. All real property owned or leased by the Company and used by the Company in the conduct of its business is accurately reflected on the books and records of the Company. True, complete and correct copies of all leases and agreements in respect of real property leased by the Company have been made available to AHA and AHA accepts the same as is. All of such leases and agreements for real property used by the Company are in full force and effect and constitute valid and binding agreements of the parties (and their successors) thereto in accordance with their respective terms. There are no leases in existence between the Company and any Stockholder, any relative of any Stockholder or any affiliate of the Company or any Stockholder in respect of any real property leased by the Company.

3.12   <u>Insurance</u>. The Company maintains such insurance policies as are reflected on its books and records.

3.13   <u>Compensation; Employment Agreements; Organized Labor Matters</u>. The books and records of the Company set forth an accurate list showing all officers, directors and key employees of the Company, listing all employment agreements with such officers, directors and key employees and the rate of compensation (and the portions thereof attributable to salary, bonus and other compensation, respectively) of each of such persons as of the date hereof. There will be no increases in the compensation payable or any special bonuses to any officer, director, key employee or other employee between the date of this Agreement and the Date of Closing, except ordinary salary increases implemented on a basis consistent with past practices.

Except as set forth on its books and records, (i) the Company is not bound by or subject to (and none of its respective assets or properties is bound by or subject to) any arrangement with any labor union, (ii) no employees of the Company are represented by any labor union or covered by any collective bargaining agreement, (iii) to the knowledge of the Company and the Stockholders, no campaign to establish such representation is in progress and (iv) there is no pending or, to the best knowledge of the Company and the Stockholders, threatened, labor dispute involving the Company and any group of its employees. The Company has not experienced any labor interruptions over the past five years.

3.14   <u>Employee Benefit Plans</u>. All employee benefit plans of the Company (including the Company's Subsidiaries), including all agreements or arrangements containing "golden parachute" or other similar provisions, and deferred compensation agreements are accurately reflected on the books and records of the Company. True, complete and correct copies of such plans, agreements and any trusts related thereto, and classifications of employees covered

6

thereby, have been made available to AHA and AHA accepts the same as is. Except for the employee benefit plans, if any, reflected on the books and records of the Company, the Company (including the Company's Subsidiaries) does not sponsor, maintain or contribute to any plan, program, fund or arrangement that constitutes an "employee pension benefit plan." Other than accrued and undistributed compensation to any key employee reflected on the books and records of the Company, neither the Company nor any Subsidiary has any obligation to contribute to or accrue or pay any benefits under any deferred compensation or retirement funding arrangement on behalf of any employee or employees. Neither the Company nor any Subsidiary has sponsored, maintained or contributed to any employee pension benefit plan not reflected on its books and records, and neither the Company nor any Subsidiary is required to contribute to any retirement plan pursuant to the provisions of any collective bargaining agreement establishing the terms and conditions or employment of any of the Company's or any Subsidiary's employees.

Any and all employee benefit plans reflected on the books and records of the Company and the administration thereof are in substantial compliance with their terms and all applicable provisions of law and any regulations issued by any governing authority. All accrued contribution obligations of the Company or any Subsidiary with respect to any plan reflected on its books and records have either been fulfilled in their entirety or are fully reflected on the books and records of the Company as of the date of this Agreement. All reports and other documents required to be filed with any governmental agency or distributed to plan participants or beneficiaries (including, but not limited to, actuarial reports, audits or tax returns) have been timely filed or distributed. No plan presently in existence, if any, has incurred an accumulated funding deficiency, and the Company (including the Company's Subsidiaries) has not incurred any liability for excise tax or penalty due to any taxing authority.

3.15    **Conformity with Law: Litigation.**    There are no lawsuits or proceedings pending or threatened against or affecting the Company, at law or in equity, or before or by any court, tribunal, municipal or other governmental department, commission, board, bureau, agency or instrumentality having jurisdiction over the Company. No notice of any claim, action, suit or proceeding, whether pending or threatened, has been received by the Company during the last three years and there is no basis therefor. The Company has conducted and now conducts its business in compliance in all material respects with all laws, regulations, writs, injunctions, decrees and orders applicable to the Company or its assets. The Company is not in violation of any law or regulation or any order of any court, tribunal, or governmental department, commission, board, bureau, agency or instrumentality having jurisdiction over any of the Company. The Company has conducted and is conducting its business in substantial compliance with the requirements, standards, criteria and conditions set forth in applicable law, ordinances, permits, licenses, orders, approvals, variances, rules and regulations.

3.16    **Taxes.**    For purposes of this Agreement, the term "taxes" shall mean all taxes, charges, fees, levies or other assessments including, without limitation, income, gross receipts, excise, property, sales, withholding, social security, unemployment, occupation, use, service, license, payroll, franchise, transfer and recording taxes, fees and charges, imposed by any country, state, local or foreign government, or subdivision or agency thereof, whether computed on a

separate, consolidated, unitary, combined or any other basis; and such term shall include any interest, fines, penalties or additional amounts attributable to or imposed with respect to any such taxes, charges, fees, levies or other assessments. The Company (including any Subsidiaries) has timely filed all requisite tax returns or extension requests due on or before the date hereof, and all such tax returns are true and accurate in all material respects. Except as set forth on Schedule 3.16, the Company has not requested or been granted an extension of the time for filing any Tax return to a date later than the Closing Date. There are no audits or examinations in progress or claims against the Company for any taxes (including penalties and interest) for any period (or portion thereof) ending on or prior to the date hereof, and no notice of any claim for taxes, whether pending or threatened, has been received. All Taxes, including interest and penalties (whether or not shown on any tax return) due and payable on or prior to the date hereof by the Company, any of the Company's subsidiaries, or any member of an affiliated or consolidated group which includes or included the Company or any of the Company's subsidiaries, have been paid. The amounts shown as accruals for taxes on the books and records of the Company are sufficient for the payment of all taxes of the kinds indicated (including penalties and interest) for all periods shown. Copies of (i) any tax examinations, (ii) extensions of time for filing and (iii) the federal, state and local income tax returns and franchise tax returns of the Company (including any subsidiaries) for the last three fiscal years, or such shorter period of time as any of them shall have existed, have been made available to AHA and are accepted by AHA as is.

3.17    **No Violations; No Consents Required.** The Company is not in violation of any of its charter or formation documents, nor in material default under any lease, instrument, license, permit or material agreement to which the Company is a party or by which its properties are bound (the "Material Documents"). The execution of this Agreement and the performance of the obligations hereunder and the consummation of the transactions contemplated hereby will not result in any material violation or breach or constitute a default under any of the terms or provisions of the Material Documents, nor will the rights and benefits of the Company under the Material Documents be adversely affected by the transactions contemplated hereby. None of the Material Documents requires notice to, or the consent or approval of, any governmental agency or other third party with respect to any of the transactions contemplated hereby in order to remain in full force and effect and consummation of the transactions contemplated hereby will not give rise to any right to termination, cancellation or acceleration or loss of any right or benefit.

3.18    **Absence of Changes.** Since the date of examination of its books and records by AHA, the Company has conducted its operations in the ordinary course of business and there has not been:

(i)     any Material Adverse Change in the financial condition, assets, liabilities (contingent or otherwise), income or business of the Company;

(ii)    any damage, destruction or loss (whether or not covered by insurance) materially adversely affecting the properties or business of the Company;

8

(iii)    any change in the authorized capital of the Company or its outstanding securities or any change in its ownership interests or any grant of any options, warrants, calls, conversion rights or commitments;

(iv)    any declaration or payment of any dividend or distribution in respect of the capital stock or any direct or indirect redemption, purchase or other acquisition of any of the capital stock of the Company;

(v)    any increase in the compensation, bonus, sales commissions or fee arrangement payable or to become payable by the Company to any of its officers, directors, stockholders, employees, consultants or agents;

(vi)    any work interruptions, labor grievances or claims filed, or any event or condition of any character, Materially Adversely Affecting the business of the Company;

(vii)    any sale or transfer, or any agreement to sell or transfer, any material assets, property or rights of Company to any person, including, without limitation, the Stockholders and their affiliates, outside of the ordinary course of business;

(viii)    any cancellation, or agreement to cancel, any indebtedness or other obligation owing to the Company, including without limitation any indebtedness or obligation of any Stockholder or any affiliate thereof;

(ix)    any plan, agreement or arrangement granting any preferential rights to purchase or acquire any interest in any of the assets, property or rights of the Company or requiring consent of any party to the transfer and assignment of any such assets, property or rights;

(x)    any purchase or acquisition of, or agreement, plan or arrangement to purchase or acquire, any property, rights or assets outside of the ordinary course of the Company's business;

(xi)    any waiver of any material rights or claims of the Company;

(xii)    any amendment or termination of any material contract,

9

agreement, license, permit or other right to which the Company is a party;

(xiii) any transaction by the Company outside the ordinary course of its business;

(xiv) any cancellation or termination of a material contract with a customer or client prior to the scheduled termination date; or

(xv) any distribution of property or assets by the Company other than in the ordinary course of business.

3.19    **Deposit Accounts; Powers of Attorney.**  The books and records of the Company accurately set forth (i) the name of each financial institution in which the Company has accounts or safe deposit boxes, (ii) the names in which the accounts or boxes are held, (iii) the type of account and account number, (iv) the type of account and the amount of cash, cash equivalents and securities held in such account, and (v) the name of each person authorized to draw thereon or have access thereto.  No person, corporation, firm or other entity holds any general or special power of attorney from the Company as of the date of this Agreement other than Powers of Attorney authorizing the execution of this Agreement on behalf of any party hereto.

3.20    **Competing Lines of Business; Related-Party Transactions.** Patrizzi does not own, directly or indirectly, any interest in, or is an officer, director, employee or consultant of, or otherwise receives remuneration from, any business which is a competitor of the Company. No officer, director or Stockholder of the Company has any interest in any property, real or personal, tangible or intangible, used in or pertaining to the Company's business.

3.21    **Disclosure.**  The Stockholders have fully provided AHA or its representatives with all information that AHA has requested in analyzing whether to consummate the transactions contemplated by this Agreement. AHA has conducted due diligence with respect to such information and accepts the same as is.  There is no fact known to the Stockholders which has specific application to the Company (other than general economic or industry conditions) which Materially Adversely Affects or, so far as the Stockholders can reasonably foresee, materially threatens, the assets, business, condition (financial or otherwise), results of operations or prospects of the Company, which has not been described in this Agreement or the Schedules hereto.

3.22    **Prohibited Activities.**  The Company has not, between the date of examination of its books and records by AHA and the date hereof, taken any of the actions set forth in Section 5.3.

3.23    **Preemptive Rights.**  No Stockholder has, and each hereby waives, any preemptive or other right to acquire shares of Company Stock or AHA Stock that such Stockholder has or may have had other than rights of any Stockholder to acquire Company Stock or AHA Stock pursuant to (i) this Agreement, (ii) any option granted by AHA, or (iii) any Employment

10

Agreement entered into between AHA and such Stockholder.

3.24    **Certain Business Practices.**  Neither the Company nor any of its affiliates has given or offered anything of value to any governmental official, political party or candidate for government office nor has it or any of them otherwise taken any action which would cause the Company to be in violation of any law regarding such practices.

3.25    No Royalties Due.  There are no royalties due and owing to ASA from any of the entities constituting the Company, nor any other subsidiary or related companies, nor are any such royalties due and owing from any of the entities constituting the Company to any other of the entities constituting the Company for use of any intellectual property of ASA, and ASA and all entities constituting the Company, and all subsidiaries thereof, have the full right to use the name "Antiquorum" without any compensation to an other entity.

## 4    REPRESENTATIONS OF AHA

AHA represents and warrants that all of the following representations and warranties set forth in this Section 4 are true at the date of this Agreement and shall be true at the time of Closing.

4.1    **Due Organization.**  AHA is a corporation duly incorporated, validly existing and in good standing under the laws of the country in which it was formed, and has the requisite power and authority to carry on its business as it is now being conducted. AHA is qualified to do business and is in good standing in each jurisdiction in which the nature of its business makes such qualification necessary, except where the failure to be so authorized or qualified would not have a Material Adverse Effect.

4.2    **Authorization.**  (i) The representatives of AHA executing this Agreement have the authority to enter into and bind AHA to the terms of this Agreement and (ii) AHA has the full legal right, power and authority to enter into this Agreement.

4.3    No Violations. The execution of this Agreement and the performance of the obligations hereunder and the consummation of the transactions contemplated hereby will not result in any violation or breach or constitute a default under any of the terms or provisions of AHA's formation documents.

4.4    **Validity of Obligations.**  The execution and delivery of this Agreement by AHA and the performance of the transactions contemplated herein have been duly and validly authorized by the Board of Directors of AHA and this Agreement has been duly and validly authorized by all necessary corporate action and is a legal, valid and binding obligation of AHA.

4.5    **Due Diligence.**  AHA has received any and all books and records that

11

it sought to review in order to decide whether to enter into this transaction and has conducted a full independent investigation and due diligence with respect to the accuracy of such books and records and the business operations of the Company. AHA accepts the books and records of the Company, and the existing business operations of the Company, as is. AHA shall not make, and hereby waives, any claims that it did not receive any material necessary for it to independently conduct its due diligence and reach its own conclusion as to this transaction, or that is relied upon any document without independent investigation of its accuracy. All conclusions as to the business operations of the Company, and its future prospects for income, were made by AHA based upon an independent investigation, and not based upon any statement or representation made by any person on behalf of the Company or any of its Stockholders.

## 5    COVENANTS PRIOR TO CLOSING

5.1    **Access and Cooperation; Due Diligence.** AHA acknowledges that it has already conducted and concluded any and all necessary Due Diligence. Notwithstanding that, between the date of this Agreement and the Closing Date, the Company will afford to the officers and authorized representatives of AHA access to all of the Company's sites, properties, books and records, and will furnish AHA with such additional operating data and other information regarding the business and properties of the Company as may be necessary, for the purpose of ensuring the continued and uninterrupted operations of the Company's business after the Closing Date.

5.2    **Conduct of Business Pending Closing.** Between the date of this Agreement and the Closing Date, the Stockholders shall operate the Company such that the Company will:

(i)    carry on its respective businesses in substantially the same manner as it has heretofore and not introduce any material new method of management, operation or accounting;

(ii)    maintain its respective properties and facilities, including those held under leases, in as good working order and condition as at present, ordinary wear and tear excepted;

(iii)    perform in all material respects all of its respective obligations under agreements relating to or affecting its respective assets, properties or rights;

(iv)    use its reasonable efforts to maintain and preserve its business organization intact, retain its respective present key employees, and maintain its respective relationships with suppliers, customers and others having business relations with the Company;

12

     (v)    maintain compliance with all material permits, laws, rules and regulations, consent orders, and all other orders of applicable courts, regulatory agencies and similar governmental authorities; and

     (vi)    maintain present debt and lease instruments and not enter into new or amended debt or lease instruments without the knowledge and consent of AHA (which consent shall not be unreasonably withheld), provided that debt and/or lease instruments may be replaced without the consent of AHA if such replacement instruments are on terms at least as favorable to the Company as the instruments being replaced.

5.3    **Prohibited Activities.** Between the date hereof and the Closing Date, the Stockholders will operate the Company such that the Company will not, without prior written consent of AHA:

     (i)    make any change in its formation documents;

     (ii)    issue any securities, options, warrants, calls, conversion rights or commitments relating to its securities of any kind other than in connection with the exercise of options or warrants;

     (iii)    declare or pay any dividend, or make any distribution in respect of its stock whether now or hereafter outstanding, or purchase, redeem or otherwise acquire or retire for value any shares of its stock;

     (iv)    enter into any contract or commitment or incur or agree to incur any liability or make any capital expenditures, except in the normal course of business consistent with past practice;

     (v)    create, assume or permit to exist any mortgage, pledge or other lien or encumbrance upon any assets or properties whether now owned or hereafter acquired, except (a) with respect to liens incurred in connection with the acquisition of inventory necessary or desirable for the conduct of the businesses of the Company, or (b) liens for taxes either not yet due or being contested in good faith and by appropriate proceedings (and for which contested taxes adequate reserves have been established and are being maintained) or (c) printers', materialmen's, mechanics', workers', repairmen's, employees' or other like liens arising in the ordinary course of business;

13

(vi)    sell, assign, lease or otherwise transfer or dispose of any property or equipment except in the normal course of business;

(vii)    negotiate for the acquisition of any business or the start-up of any new business;

(viii)    merge or consolidate or agree to merge or consolidate with or into any other corporation or other entity;

(ix)    waive any material rights or claims of the Company, provided that the Company may negotiate and adjust bills in the course of good faith disputes with customers in a manner consistent with past practice;

(x)    commit a material breach or amend or terminate any material agreement, permit, license or other right of the Company;

(xi)    enter into any other transaction outside the ordinary course of its business or prohibited hereunder; or

(xii)    increase or commit to any increase in the salary, bonus, commission or other compensation of any officer, director, employee or agent of the Company.

5.4    **No Shop.** None of the Stockholders, the Company, nor any agent, officer, director, trustee or any representative of any of the foregoing will, during the period commencing on the date of this Agreement and ending with the earlier to occur of the Closing Date or the termination of this Agreement in accordance with its terms, directly or indirectly:

(i)    solicit or initiate the submission of proposals or offers from any person for,

(ii)    participate in any discussions pertaining to, or

(iii)    furnish to any person other than AHA, the authorized agents of AHA and the financial and legal advisors of the Company and the Stockholders any information relating to (a) any acquisition or purchase of all or a material amount of the assets of, or any equity interest in, the Company or (b) a merger, consolidation or business combination involving the Company.

14

5.5 <u>Notification of Certain Matters</u>. The Stockholders shall give prompt notice to AHA of (i) the occurrence or non-occurrence of any event the occurrence or non-occurrence of which would be likely to cause any representation or warranty of the Stockholders contained herein to be untrue or inaccurate in any material respect at or prior to the Closing and (ii) any material failure of any Stockholder to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by such person hereunder. AHA shall give prompt notice to the Company of (a) the occurrence or non-occurrence of any event the occurrence or non-occurrence of which would be likely to cause any representation or warranty of AHA contained herein to be untrue or inaccurate in any material respect at or prior to the Closing and (b) any material failure of AHA to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder. The delivery of any notice pursuant to this Section 5.5 shall not be deemed to (1) modify the representations or warranties hereunder of the party delivering such notice, (2) modify the conditions to Closing set forth herein, or (3) limit or otherwise affect the remedies available hereunder to the party receiving such notice.

5.6 <u>Further Assurances</u>. At any time before or after the Closing, the parties hereto agree to execute and deliver, or cause to be executed and delivered, such further instruments or documents or take such other action as may be reasonably necessary or convenient to carry out the transactions contemplated hereby.

6   **CONDITIONS PRECEDENT TO OBLIGATIONS OF STOCKHOLDERS**

The obligations of the Stockholders with respect to actions to be taken on the Closing Date are subject to the satisfaction or waiver on or prior to the Closing Date of all of the following conditions.

6.1 <u>Representations and Warranties; Performance of Obligations</u>. All representations and warranties of AHA contained in Section 4 that are qualified by materiality shall be true and correct and all other representations and warranties of AHA contained in Section 4 shall be true and correct in all material respects, in each case as of the Closing Date with the same force and effect as though such representations and warranties had been made on and as of the Closing Date; and all terms, covenants and conditions of this Agreement to be complied with or performed by AHA on or before the Closing Date shall have been duly complied with and performed in all material respects.

6.2 <u>No Material Adverse Effect</u>. Since the date of this Agreement, no event or circumstance shall have occurred which has had, or reasonably could be expected to have, a Material Adverse Effect on AHA, and AHA shall not have suffered any change, loss or damage to any of its properties or assets, whether or not covered by insurance, which change, loss or damage could materially affect or impair the ability of AHA to conduct its business.

6.3 <u>Consents and Approvals</u>. All necessary consents of and filings with

15

any governmental authority or agency relating to the consummation of the transaction contemplated herein shall have been obtained and made; and no action or proceeding shall have been instituted or threatened to restrain or prohibit the transaction.

      6.4    **Employment Agreement.**  Patrizzi shall have executed an Employment or Consultation Agreement with the Company acceptable to AHA and Patrizzi.

## 7     CONDITIONS PRECEDENT TO OBLIGATIONS OF AHA

      The obligations of AHA with respect to actions to be taken on the Closing Date are subject to the satisfaction or waiver on or prior to the Closing Date of all of the following conditions.

      7.1    **Representations and Warranties; Performance of Obligations.** All representations and warranties of the Stockholders contained in this Agreement that are qualified by materiality shall be true and correct and all other representations and warranties of the Stockholders contained in this Agreement shall be true and correct in all material respects, in each case as of the Closing Date with the same force and effect as though such representations and warranties had been made on and as of the Closing Date; and all terms, covenants and conditions of this Agreement to be complied with or performed by the Stockholders on or before the Closing Date shall have been duly complied with and performed in all material respects.

      7.2    **No Material Adverse Effect.** Since the date of this Agreement, no event or circumstance shall have occurred which has had, or could reasonably be expected to have, a Material Adverse Effect on the Company, and the Company shall not have suffered any change, loss or damage to any of its properties or assets, whether or not covered by insurance, which change, loss or damage could materially affect or impair the ability of the Company to conduct its business.

      7.3    **Consents and Approvals.** All necessary consents of and filings with any governmental authority or agency relating to the consummation of the transactions contemplated herein shall have been obtained and made; and all necessary consents and approvals of third parties shall have been obtained.

      7.4    **Employment Agreement.**  Patrizzi shall have executed an Employment or Consultation Agreement with the Company acceptable to AHA and Patrizzi.

## 8     GUARANTEE

      No guarantee of this Agreement by any entity other than the parties hereto has been given or received.

16