9    **INDEMNIFICATION**

The Stockholders and AHA each make the following covenants that are applicable to them, respectively:

9.1   <u>Survival of Representations and Warranties.</u>

(i)    The representations and warranties of the Stockholders made in this Agreement shall survive the stock purchase for a period of one (1) year following the Closing Date, <u>provided, however,</u> that all representations and warranties with respect to which a claim is made within the applicable survival period shall survive until such claim is finally determined and paid.

(ii)   The representations and warranties of AHA made in this Agreement and in the certificates delivered in connection herewith shall survive the stock purchase for a period of one (1) year following the Closing Date; <u>provided, however,</u> that representations and warranties with respect to which a claim is made within the applicable survival period shall survive until such claim is finally determined and paid.

(iii)  The date on which a representation or warranty expires as provided herein is herein called the "Expiration Date." No claim of any kind may be made with respect to a representation or warranty after the Expiration Date.

9.2   <u>General Indemnification by the Parties.</u>  The parties hereto each covenant and agree that they will jointly and severally indemnify, defend, protect, and hold harmless the other parties and their respective subsidiaries and officers, directors, employees, stockholders, agents, representatives and affiliates at all times from and after the date of this Agreement until the Expiration Date from and against all claims, damages actions, suits, proceedings, demands, assessments, adjustments, costs and expenses (including specifically, but without limitation, reasonable attorneys' fees and expenses of investigation) (collectively "Damages") incurred by such indemnified person as a result of or incident to any other parties' (i) breach of any representation or warranty set forth herein or in any documents attached hereto, and/or (ii) breach or non-fulfillment of any covenant or agreement.  Notwithstanding the foregoing, or anything else contained in this Agreement, the indemnification liability of each Stockholder under this Agreement shall be limited to the actual amount of the Purchase Price received by such Stockholder.

9.3   <u>Third Person Claims.</u>  Promptly after any party hereto (the "Indemnified Party") has received notice of or has knowledge of any claim by a person or entity not a party to this Agreement ("Third Person") or the commencement of any action or proceeding by a

17

Third Person that may give rise to a right of indemnification hereunder, such Indemnified Party shall give to the party obligated to provide indemnification hereunder (an "Indemnifying Party") written notice of such claim or the commencement of such action or proceeding; provided, however, that the failure to give such notice will not relieve such Indemnifying Party from liability under this Section 9 with respect to such claim, action or proceeding, except to the extent that the Indemnifying Party has been actually prejudiced as a result of such failure. The Indemnifying Party (at its own expense) shall have the right and shall be given the opportunity to participate with the Indemnified Party in the defense of such claim, suit or proceeding, provided that counsel for the Indemnified Party shall act as lead counsel in all matters pertaining to the defense or settlement of such claim, suit or proceeding. The Indemnified Party shall not, except at its own cost, make any settlement with respect to any such claim, suit or proceeding without the prior consent of the Indemnifying Party, which consent shall not be unreasonably withheld or delayed. It is understood and agreed that in situations where failure of the Indemnifying Party to settle a claim expeditiously could have an adverse effect on the Indemnified Party, the failure of the Indemnifying Party to act upon the Indemnified Party's request for consent to such settlement within 10 business days of the Indemnifying Party's receipt of notice thereof from the Indemnified Party shall be deemed to constitute consent by the Indemnifying Party of such settlement for purposes of this Section 9.

9.4    **Method of Payment.** Except as otherwise provided herein, all claims for indemnification shall be paid in cash. No party shall be entitled to indemnification under this Section 9 if and to the extent that such party's claim for indemnification is directly or indirectly caused by a breach by such party of any representation, warranty, covenant or other agreement set forth is this Agreement.

## 10    TERMINATION OF AGREEMENT

This Agreement may only be terminated at any time prior to the Closing Date by mutual written and duly executed consent of the Stockholders and AHA.

## 11    NON-COMPETITION

11.1    **Prohibited Activities.** Patrizzi will not, for a period of six (6) years following the Closing Date, and provided that the Company is in compliance with any employment or consultation agreement entered into with him, for any reason whatsoever, directly or indirectly, for himself or on behalf of or in conjunction with any other person, persons, company, partnership, corporation or business of whatever nature:

(i)    engage, as an officer, director, shareholder, owner, partner, joint venturer, or in a managerial capacity, whether as an employee, independent contractor, consultant or advisor, or as a sales representative, in any watch auction business in competition with the Company or any of its subsidiaries;

18

(ii)    call upon any person who is an employee of AHA, the Company or any of their subsidiaries for the purpose or with the intent of enticing such employee away from or out of the employ of AHA, the Company or any of their subsidiaries;

(iii)    call upon any person or entity which is, or has been within two years prior to the Closing Date, a customer of the Company or any of its subsidiaries for the purpose of soliciting or selling products or services in direct competition with the Company or any of its subsidiaries.

Notwithstanding the above, the foregoing covenant shall not be deemed to prohibit Patrizzi from acquiring as a passive investor with no involvement in the operations or management of the business, not more than one percent (1%) of the capital stock of a competing business whose stock is traded on a recognized securities exchange or on an over-the-counter or similar market.

11.2    **Equitable Relief.** Because of the difficulty of measuring economic losses to AHA and the Company as a result of a breach of the foregoing covenant, and because of the immediate and irreparable damage that could be caused to AHA for which it would have no other adequate remedy, Patrizzi agrees that the foregoing covenant may be enforced by AHA in the event of breach by injunctions, restraining orders and other equitable actions.

11.3    **Reasonable Restraint.** It is agreed by the parties hereto that the foregoing covenants in this Section 11 impose a reasonable restraint on Patrizzi in light of the activities and business of the Company on the date of the execution of this Agreement and the current plans of the Company.

11.4    **Severability; Reformation.** The covenants in this Section 11 are severable and separate, and the unenforceability of any specific covenant shall not affect the provisions of any other covenant. Moreover, in the event that any court or tribunal of competent jurisdiction shall determine that the scope, time or territorial restrictions set forth are unreasonable, then it is the intention of the parties that such restrictions be enforced to the fullest extent which the court or tribunal deems reasonable, and the Agreement shall thereby be reformed.

11.5    **Independent Covenant.** Patrizzi acknowledge that his covenants set forth in this Section 11 are material conditions to AHA's willingness to execute and deliver this Agreement and to consummate the transactions contemplated hereby. Other than the requirement that AHA remain in compliance with the provisions of the employment or consultation agreement entered into between AHA and Patrizzi, the covenants in this Section 11 shall be construed as an agreement independent of any other provision in this Agreement, and the existence of any claim or cause of action against AHA or any subsidiary thereof, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by AHA of such covenants. It is specifically agreed that the period of three years stated at the beginning of this Section 11, during

19

which the agreements and covenants of Patrizzi shall be effective, shall be computed by excluding from such computation any time during which Patrizzi is determined by a court or tribunal of competent jurisdiction or by agreement of the parties to have been in violation of any provision of this Section 11. The covenants contained in Section 11 shall have no effect if the transactions contemplated by this Agreement are not consummated.

## 12.  NON-DISCLOSURE OF CONFIDENTIAL INFORMATION

12.1  **Stockholders' Obligations.**  The Stockholders recognize and acknowledge that they had in the past, currently have, and in the future may possibly have, access to certain confidential information of the Company and/or AHA, such as operational policies, pricing and cost policies, and other information, that are valuable, special and unique assets of the Company and/or AHA. The Stockholders agree that they will not disclose such confidential information to any person, firm, corporation, association or other entity for any purpose or reason whatsoever, except (a) to authorized representatives of AHA, (b) following the Closing, such information may be disclosed by the Stockholders as is required in the course of performing their duties for AHA or the Company, and (c) to counsel and other advisers, provided that such advisers (other than counsel) agree to the confidentiality provisions of this Section 12.1, unless (i) such information becomes known to the public generally through no fault of the Stockholders, or (ii) disclosure is required by law or the order of any governmental authority under color of law, provided, that prior to disclosing any information pursuant to this clause (ii), the Stockholders shall, if possible, give prior written notice thereof to AHA and provide AHA with the opportunity to contest such disclosure. In the event of a breach or threatened breach by any of the Stockholders of the provisions of this Section, AHA shall be entitled to injunctive or other equitable relief restraining such Stockholders from disclosing, in whole or in part, such confidential information. Nothing herein shall be construed as prohibiting AHA from pursuing any other available remedy for such breach or threatened breach, including the recovery of damages.

12.2  **Equitable Relief.** Because of the difficulty of measuring economic losses as a result of the breach of the foregoing covenants, and because of the immediate and irreparable damage that would be caused for which AHA would have no other adequate remedy, the Stockholders agree that the foregoing covenants may be enforced against them by injunctions, restraining orders and other appropriate equitable relief.

12.3  **Survival.** The obligations of the parties under this Article 12 shall survive the termination of this Agreement for a period of one (1) year.

## 13.  ESCROW

13.1. **Identity of Escrow Agent.** For the purposes of this Agreement, The Law Firm of Michael Levine, P.C. ("Escrow Agent") shall act as escrow agent hereunder and shall act strictly in accordance with this Section 13 of this Agreement.

20

13.2. <u>Payment of Purchase Price In Escrow</u>.  The portions of the Purchase Price required to be paid pursuant to Section 2.2(a), (b), (c) and (d) of this Agreement shall be paid in escrow to Evan Zimmermann, Esq. (the "Transfer Escrow Agent"), who shall immediately transfer such funds to the Escrow Agent.

13.3. <u>Tender of Shares in Escrow</u>.  The certificates evidencing ownership of the Company Stock, together with Stock Powers transferring the same to AHA, required to be delivered pursuant to Section 1.1 of this Agreement, shall be delivered by the Stockholders to the Escrow Agent, to be held in escrow.  Escrow Agent shall notify all parties to this Agreement upon receipt of the stock certificates and Stock Powers.  Notwithstanding the foregoing, Habsburg or its transferees may deliver the certificate evidencing their ownership of the Company Stock (the "Habsburg Shares"), together with the Stock Power transferring those shares to AHA, to AdviCorp ("Transfer Agent"), with offices at Via Parigi 11, Rome 00185, Italy, to be held by the Transfer Agent in escrow pending receipt from the Escrow Agent of the *pro rata* portion of the purchase price attributable to such shares (the "Habsburg Funds"), provided however that a separate escrow agreement shall be entered into between the Escrow Agent and the Transfer Agent requiring the delivery of the Habsburg Shares and Stock Powers to the Escrow Agent by the Transfer Agent upon receipt of a wire transfer of the Habsburg Funds.

13.4. <u>Release of Escrow Funds/Share Certificates/Stock Powers</u>.  Escrow Agent shall, release any funds, share certificates, and stock powers, received by it in escrow, only in strict compliance with following:

13.4.1.   <u>Release of Stock Certificates and Powers/Liquidated Damages</u>.  Upon receipt by the Escrow Agent of cleared funds from AHA for the portions of the Purchase Price required by Section 2.2(a), (b) and (c) of this Agreement, the Escrow Agent shall release to AHA fifty percent (50%) of the issue and outstanding shares of ASA, C2C, AUSA and AHK, whereupon all obligations of the Stockholders shall be deemed discharged in full and the Stockholders shall cause appropriate entries to be made by the appropriate person with authority to do so to all necessary books, records and/or shareholder ledgers of the Company, or to adjust such books, records and/or shareholders ledgers, to reflect the ownership of fifty percent (50%) of the Company Stock by AHA. In the event of a default by AHA in making any of the payments required to be made pursuant to Section 2.2(b), (c) or (d) of this Agreement, Escrow Agent shall release each of the share certificates and Stock Powers to the respective party who owned the same prior to the delivery of the same to Escrow Agent, and the Stockholders shall retain, as liquidated damages, any funds previously disbursed to them by Escrow Agent, whereupon this Agreement shall be deemed terminated and no party shall have any further obligation to any other party.

13.4.2. <u>Release of Initial Escrow Funds</u>.  The Escrow Agent shall, immediately upon receipt, release from escrow, and disburse, the funds previously received by it pursuant to Section 2.2(a) and (b) of this Agreement, as follows:

A.   Escrow Agent shall first pay any closing costs and

21

Attorneys' Fees of the Stockholders' Transaction Attorney, Michael L. Levine, Esq.;

B. Escrow Agent shall next pay any remaining funds in such manner as is reflected on the written Disbursement Instructions executed by each Stockholder and delivered to Escrow Agent; provided, however, that the Escrow Agent shall only release funds to such shareholders of the Company as deliver its or his shares to the Escrow Agent or the Transfer Agent when the same are actually delivered in accordance with eth provisions of this Stock Purchase Agreement.

13.4.3.  **Release of Balance of Escrow Funds.**  The Escrow Agent shall, immediately upon receipt, release from escrow, and disburse, the funds previously received by it pursuant to Section 2.2(c) and (d) of this Agreement, as follows:

A. Escrow Agent shall pay to ASA the sum of CHF 2,588,800;

B. Escrow Agent shall next pay any remaining funds in such manner as is reflected on the written Disbursement Instructions executed by each Stockholder and delivered to Escrow Agent.

13.5.  **Liability of Escrow Agent.**  Nothing herein contained shall be deemed to obligate the Escrow Agent to deliver any share certificates, Stock Power, or funds except as herein specifically provided.  The Escrow Agent shall not be responsible in any manner for the validity, nonaccessability, or sufficiency of any share certificate delivered to it hereunder or for the regularity of the issuance thereof.  The Escrow Agent shall not be bound or in any way effected by any notice of any modification, cancellation, abrogation, or rescission of this Agreement, or of any fact or circumstance affecting to alleged to affect the rights or liabilities of the parties hereto other than as in this Agreement set forth, or affecting or alleged to affect the rights or liabilities of any other person, unless signified to it in writing, delivered to it, signed by all the parties to this Agreement, and by all such other persons; nor, in the case of a modification, unless such modification shall be satisfactory to the Escrow Agent and executed by all parties to this Agreement.

13.6.  **Actions of Escrow Agent.**  The Escrow Agent's duties are ministerial and are limited to those specifically set out in this Agreement.  The Escrow Agent shall have no duties or responsibilities other than those expressly set forth herein, nor shall it have any duty to enforce any obligation of any person to make any payment or delivery, or to direct or cause any payment or delivery to be made, or to enforce any obligation of any person to perform any other act.  The Escrow Agent shall be under no liability to any party by reason of any failure on the part of any other party to perform such party's obligations under this Agreement.  The Escrow Agent shall not receive any compensation for the services to be rendered by it in that capacity; provided, however, that Escrow Agent may retain any interest accumulated upon any funds as an administrative fee and may represent Stockholders (or any of them) as legal counsel and receive compensation directly from such Stockholders for such representation. The Escrow Agent is under no duty or obligation to

22

exercise any judgment or care whatsoever in holding, releasing, or delivering any property or funds received by it, and shall not be liable for the consequences of any act by it, provided that Escrow Agent has acted in accordance with this Agreement or written instructions or notices given to it by all of the parties hereto, upon which Escrow Agent may rely without investigation as to authenticity or intent. Additionally, the Escrow Agent shall not be liable for any action taken by it, or not taken by it, in connection with this Agreement or otherwise, provided that Escrow Agent has acted in accordance with written instructions or notices given to it by all of the parties, and further provided that Escrow Agent shall be responsible for any willful default or gross negligence on its part. The Escrow Agent is hereby authorized and empowered to construe this Agreement and/or any written instructions or notices received by it, and such construction shall be binding on all parties to this Agreement. In the event that the Escrow Agent receives conflicting instructions from the parties, or in the event that any party contests any notice delivered to the Escrow Agent by the other party, or in the event of a dispute between the parties as to actions to be taken by the Escrow Agent, the Escrow Agent shall refuse to act in accordance with the instructions or notice of either party unless or until a final order is issued by a Court or tribunal of competent jurisdiction. In the event the Escrow Agent receives such conflicting instructions or protest, or in the event of any dispute among the parties, Escrow Agent may, but shall not be required to, commence, by mail service of process, an interpleader action in the jurisdiction where the Escrow Agent is located, upon notice to all parties hereto, seeking a declaratory judgment as to the manner in which the Escrow Agent should act, and the parties hereto hereby consent to the subject matter and *in personam* jurisdiction of the court or tribunal where such interpleader action is commenced. In the event that such action is commenced by Escrow Agent, Escrow Agent may employ counsel and such other agents as it in its sole discretion deems necessary, and the parties hereto shall jointly and severally reimburse the Escrow Agent for all actual expenses incurred or paid for all services rendered by such counsel and agents, and for all disbursements incurred by the Escrow Agent or such counsel and agents in connection therewith including, but not limited to, any fees or disbursements incurred in connection with the commencement of any such interpleader action. Escrow Agent shall have no liability, and the parties hereby indemnify and hold Escrow Agent harmless for acting in accordance with this Agreement, except that Escrow Agent shall be responsible for any willful default or gross negligence on its part.

13.7. **Prior Representation.** It is understood that the Escrow Agent has represented one or more of the Stockholders in the negotiation and execution of this Agreement. It is agreed that, in the event that any dispute or litigation arises out of this Agreement, or for its interpretation, the Escrow Agent may represent one or more of the Stockholders in any such dispute or litigation, notwithstanding its capacity as Escrow Agent hereunder.

14.    SECURITIES LAW MATTERS

14.1    **Economic Risk; Sophistication.** AHA represents and warrants that it has not relied on any representation by any representative of the Company or any Stockholder's representatives in connection with the acquisition of shares of stock of the Company hereunder. AHA (i) has such knowledge, sophistication and experience in business and financial matters that it

23

is capable of evaluating the merits and risks of an investment in the shares of stock, (ii) fully understand the nature, scope and duration of any limitations on transfer described in this Agreement and (iii) can bear the economic risk of an investment in the shares of stock and can afford a complete loss of such investment. AHA has had an adequate opportunity to ask questions and receive answers from the Stockholders and their representatives concerning any and all matters relating to the transactions described herein including without limitation the background and experience of the officers and directors of ASA, the plans for the operations of the business of ASA, the business, operations and financial condition of ASA, and any plans for additional acquisitions and the like. AHA has asked any and all questions in the nature described in the preceding sentence and all questions have been answered to its satisfaction.

       14.2   **Compliance with Law.** AHA covenants that none of the stock acquired hereby will be offered, sold, assigned, hypothecated, transferred or otherwise disposed except after full compliance with all applicable provisions of law, and the rules and regulations of any governing authority.

## 15.   GENERAL

       15.1   **Cooperation.** The Stockholders and AHA shall each deliver or cause to be delivered to the other on the Closing Date, and at such other times and places as shall be reasonably agreed to, such additional instruments as the other may reasonably request for the purpose of carrying out this Agreement. The Stockholders will cooperate and use their reasonable efforts to have the present officers, directors and employees of the Company cooperate with AHA on and after the Closing Date in furnishing information, evidence, testimony and other assistance in connection with any tax return filing obligations, actions, proceedings, arrangements or disputes of any nature with respect to matters pertaining to all periods prior to the Closing Date.

       15.2   **Successors and Assigns.** This Agreement and the rights of the parties hereunder may not be assigned (except by operation of law) and shall be binding upon and shall inure to the benefit of the parties hereto, and their successors, heirs, and legal representatives.

       15.3   **Entire Agreement.** This Agreement (including the Schedules attached hereto) constitute the entire agreement and understanding among the Stockholders and AHA and supersede any prior agreement and understanding relating to the subject matter of this Agreement. This Agreement, upon execution, constitutes a valid and binding agreement of the parties hereto enforceable in accordance with its terms and may be modified or amended only by a written instrument executed by the Stockholders and AHA acting through its respective officers, duly authorized by their respective Boards of Directors.

       15.4   **Counterparts.** This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute but one and the same instrument. Facsimile signatures shall be deemed the equivalent of original signatures. Any party may authorize its or his signature to be affixed to this Agreement by an agent, provided that such agent is given a written, and duly executed and acknowledged, Power of

Attorney authorizing such agent to do so, and further provided that a copy of such Power of Attorney is annexed to this Agreement.

15.5    **Brokers and Agents.** Each party represents and warrants that it is solely responsible for payment of any commissions or finder's fees to such brokers or agents as were retained by such party in connection with this transaction. Each party agrees to indemnify the other parties hereto against all loss, cost, damages or expense arising out of claims for fees or commission of brokers or agents employed or alleged to have been employed by such indemnifying party.

15.6    **Expenses.** Whether or not the transactions herein contemplated shall be consummated, AHA will pay the fees and expenses of AHA's representatives, accountants and counsel incurred in connection herewith, and the Stockholders will pay the fees and expenses of the Stockholders' and the Company's representatives, accountants and counsel incurred in connection herewith. Each party shall pay all sales, use, transfer, real property transfer, recording, gains, stock transfer and other similar taxes and fees ("Transfer Taxes") applicable to it in connection with the stock transfer. The parties shall respectively file all necessary documentation and returns with respect to such Transfer Taxes due by it.

15.7    **Notices.** All notices and communications required or permitted hereunder shall be in writing and shall be given by (i) facsimile transmission *and* mail, or (ii) causing the same to be delivered in person to an officer or agent of such party, as follows:

(i)    If to AHA, addressed to it at:

    Aoyama Bulilding 3F
    1-1-8 Shibuya, Shibuys-ku,
    Tokyo, Japan
    Attn: _____
    Fax: _____

(ii)    If to Habsburg, addressed to it at:

    P.O. Box 1633
    Ch-1211 Geneva 1
    Switzerland
    Attn: S.L. Verhoeven
    Fax: 41/22/7340245

(iii)    If to Patrizzi, addressed to him at:

    16 bis rue Bel Respiro
    Monte-Carlo, 98000

25

Principauti de Monaco
Fax: 011-41-22-909-2860

with a copy to:

Evan Zimmermann, Esq.
295 Madison Avenue
Suite 700
New York, NY 10017

(vi) If to Escrow Agent, addressed to it as follows:

The Law Firm of Michael Levine, P.C.
15 Barclay Road
Scarsdale, New York 10583
Att: Michael Levine, Esq.
Fax: 914-725-4778

or to such other address or counsel as any party hereto shall specify pursuant to this Section 15.7 from time to time.

15.8  **Governing Law.**  This Agreement shall be construed in accordance with the laws of the State of New York, United States of America, regardless of any conflict of law provisions in any jurisdiction.  Any and all disputes arising out of or in connection with this Agreement shall be finally determined under the Rules of Arbitration of the International Chamber of Commerce ("ICC") by one or more arbitrators appointed in accordance with the said Rules.  Any arbitration proceeding shall and must be commenced and heard in Japan.  The parties hereto irrevocably consent to the jurisdiction of the ICC in Japan, over any dispute arising from this Agreement or its interpretation or enforcement.  Judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.

15.9  **Exercise of Rights and Remedies.**  Except as otherwise provided herein, no delay of or omission in the exercise of any right, power or remedy accruing to any party as a result of any breach or default by any other party under this Agreement shall impair any such right, power or remedy, nor shall it be construed as a waiver of or acquiescence in any such breach or default, or of any similar breach or default occurring later; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default occurring before or after that waiver.

15.10  **Time.**  Time is of the essence with respect to this Agreement.

15.11  **Reformation and Severability.**  In case any provision of this Agreement shall be invalid, illegal or unenforceable, it shall, to the extent possible, be modified in

26

such manner as to be valid, legal and enforceable but so as to most nearly retain the intent of the parties, and if such modification is not possible, such provision shall be severed from this Agreement, and in either case the validity, legality and enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired thereby.  The parties acknowledge that they have previously executed a Stock Purchase Agreement of even date herewith (the "original agreement"), which was subsequently modified by way of an Addendum effective January 13, 2006. The parties intend this executed agreement to supercede and replace the original agreement and addendum.

15.12   **Remedies Cumulative.**  No right, remedy or election given by any term of this Agreement shall be deemed exclusive but each shall be cumulative with all other rights, remedies and elections available at law or in equity.

15.13   **Captions.**   The headings of this Agreement are inserted for convenience only, and shall not constitute a part of this Agreement or be used to construe or interpret any provision hereof.

15.14   **No Drafter Inference.**   This Agreement was agreed to after substantial negotiation.  As such, no party hereto shall be deemed or construed as the "drafter" of this Agreement for any purpose and no inferences shall be drawn against any party by virtue of any ambiguous language contained herein.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

ARTIST HOUSE HOLDINGS, INC.

By:

HABSBURG HOLDINGS LTD.

By:

OSVALDO PATRIZZI

27

THE LAW FIRM OF
MICHAEL LEVINE, P.C.,
Escrow Agent

By: _____
Michael Levine, Esq.

_____
Evan Zimmermann, Esq.
Transfer Escrow Agent

28

## SCHEDULE 3.3

### Share Ownership (Prior to Date of Closing)

**Antiquorum S.A.:**

HABSBURG HOLDINGS LTD. – 2100 shares

**Antiquorum USA, Inc.:**

Antiquorum S.A. – 25 shares
Osvaldo Patrizzi – 24 shares

**C2C Time, Inc.:**

Antiquorum S.A. – 30 shares
Antiquorum USA, Inc. – 35 shares
Osvaldo Patrizzi – 35 shares

## SCHEDULE 3.4

### Subsidiaries

Antiquorum S.A. ("ASA") has the following wholly-owned subsidiary:

1. Antiquorum Auctioneers (Hong Kong) Ltd.

   (wholly owned by ASA, except 1 share is held on behalf of, and for the account of, ASA by each of two nominee companies: Red Seal Limited and Common Seal Limited)

2. SAS Antiquorum France

   (wholly owned by ASA)

3. Antiquorum Japan

   (wholly owned by ASA)

30

## SCHEDULE 3.16

### Outstanding Tax Return Extensions

Tax returns for Antiquorum USA, Inc. for tax year 2004 are on extension.

Tax returns for Antiquorum Auctioneers (Hong Kong) Ltd. for tax year 2004 are on extension.

B

AO 88A  (Rev. 12/13) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

### for the

Southern District of New York

| | | |
|---|---|---|
| IN RE:   LETTER ROGATORY FOR INTERNATIONAL | ) | |
| JUDICIAL ASSISTANCE FROM THE COURT OF | ) | |
| FIRST INSTANCE, REPUBLIC AND CANTON OF | ) | Civil Action No.    M 19-84 |
| GENEVA, SWITZERLAND, IN THE MATTER OF | ) | |
| ANTIQUORUM SA v. OSVALDO PATRIZZI AND | ) | |
| SIMON LEENDERT VERHOEVEN | ) | |
| | ) | |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:   Michael Levine
    15 Barclay Road, Scarsdale, NY 10583
                               *(Name of person to whom this subpoena is directed)*

☑ *Testimony:*  **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.  If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:  The matters to be covered during the deposition are set forth in the Execution Affidavit attached hereto as Rider A.  If you complete the Execution Affidavit, sign the last page before a notary public, and return it to the Assistant United States Attorney below on or before _____ __, 2014, you may not need to appear for the deposition.

| Place: | U.S. Attorney's Office, Southern District of New York 86 Chambers Street, 3rd Floor, New York, NY 10007 | Date and Time: |
|---|---|---|

The deposition will be recorded by this method:   Stenography

☐ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

            *CLERK OF COURT*

                                   OR

    _____             _____
      *Signature of Clerk or Deputy Clerk*                    *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   U.S.A. on behalf of the Court of First Instance, Republic and Canton of Geneva, Switzerland , who issues or requests this subpoena, are:

Louis A. Pellegrino, Assistant United States Attorney, U.S. Attorney's Office for the Southern District of New York, 86 Chambers Street, 3rd Floor, New York, NY 10007. Email:  louis.pellegrino@usdoj.gov.  Tel.:  212-637-2689

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  12/13) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. M 19-84

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)*   Michael Levine
_____

on *(date)* _____ .

☐  I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____ on *(date)* _____ ; or

☐  I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A (Rev. 12/13) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

(1) *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

(2) *For Other Discovery.* A subpoena may command:
(A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*
(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*

(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or
(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*
(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# Rider A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
IN RE:                                       :
                                             :
LETTER ROGATORY FOR                          :
INTERNATIONAL JUDICIAL                       :         M 19-84
ASSISTANCE FROM THE COURT                    :
OF FIRST INSTANCE, REPUBLIC AND   :
CANTON OF GENEVA, SWITZERLAND, :
IN THE MATTER OF ANTIQUORUM SA :
v. OSVALDO PATRIZZI AND SIMON     :
LEENDERT VERHOEVEN                           :
                                             :
------------------------------------------------------x

## EXECUTION AFFIDAVIT OF LETTER ROGATORY

I, Michael Levine, state under oath:

I have been furnished by the United States Attorney for the Southern District of New

York with a copy of a letter rogatory, issued pursuant to the Hague Convention on the Taking of

Evidence Abroad in Civil and Commercial Matters.  The letter rogatory seeks information

relating to a civil case captioned "Antiquorum SA v. Osvaldo Patrizzi and Simon Leendert

Verhoeven," and pending before the Court of First Instance, Republic and Canton of Geneva,

Switzerland.

The following are my responses to the questions contained in the letter rogatory.  These

responses are based upon personal knowledge.

-1-

Question 1):

What is your profession and with whom are you currently working?

Response to Question 1):

Question 2):

What were and what currently are your ties to ANTIQUORUM SA, ARTIST HOUSE

HOLDINGS Inc., HABSBURG HOLDINGS Ltd., Osvaldo PATRIZZI and Simon Leendert

VERHOEVEN?

Response to Question 2):

Question 3):

When and in what context did you first come into contact with ANTIQUORUM SA and Osvaldo

PATRIZZI?  Under whose instructions?

Response to Question 3):

Question 4):

Did you participate in the negotiations conducted in view of the acquisition of the shares of

ANTIQUORUM SA by ARTIST HOUSE HOLDINGS Inc. and in what manner?

Response to Question 4):

Question 5):

How were those negotiations conducted?

Response to Question 5):

Question 6):

Did Evan ZIMMERMANN participate in those negotiations and in what manner?

Response to Question 6):

Question 7):

Were ANTIQUORUM SA, ARTIST HOUSE HOLDINGS Inc., HABSBURG HOLDINGS Ltd. and Osvaldo PATRIZZI represented in those negotiations and by whom?

Response to Question 7):

Question 8):

Were ANTIQUORUM SA, ARTIST HOUSE HOLDINGS Inc., HABSBURG HOLDINGS Ltd. and Osvaldo PATRIZZI also represented at the signing of the contract of sale of shares and the "Consulting Agreement" of December 9, 2005, and by whom?

Response to Question 8):

-4-

<u>Question 9):</u>

Did ANTIQUORUM SA at that time have several shareholders and who were they?

<u>Response to Question 9):</u>

<u>Question 10):</u>

If relevant, for what reasons does "Schedule 3.3." of the contract of sale of shares of December 9, 2005 state that HABSBURG HOLDINGS Ltd. is the holder of the entire share capital of ANTIQUORUM SA?

<u>Response to Question 10):</u>

<u>Question 11):</u>

If relevant, were any internal agreements concluded between the various shareholders of ANTIQUORUM SA and, if so, who drew them up?

<u>Response to Question 11):</u>

Question 12):

Was a due diligence procedure concerning ANTIQUORUM SA carried out in the framework of those negotiations?

Response to Question 12):

Question 13):

If relevant, when was that due diligence procedure carried out, why and by whom?

Response to Question 13):

Question 14):

If relevant, did that due diligence procedure concern the valuation of the assets belonging to ANTIQUORUM SA?

Response to Question 14):

Question 15):

Did you take cognizance of the inventory referred to in Exhibit A and at what date?

Response to Question 15):

Question 16):

When was that inventory drawn up, why and by whom?

Response to Question 16):

Question 17):

Were representatives of ARTIST HOUSE HOLDINGS Inc. present during the drawing up of the inventory and/or did they verify it?

Response to Question 17):

Question 18):

To whom was that inventory sent?

Response to Question 18):

Question 19):

Was a PATEK PHILIPPE calibre 89 watch included in that inventory?

Response to Question 19):

Question 20):

Before the signing of the contract of sale of shares of December 9, 2005, did Osvaldo PATRIZZI

mention any bonuses due to him for previous years?

Response to Question 20):

Question 21):

Did the accounts of ANTIQUORUM SA record a debt due to Osvaldo PATRIZZI and Michel

COHENDET for prior bonuses?

Response to Question 21):

Question 22):

Did any decision of the general meeting of shareholders or the board of directors of

ANTIQUORUM SA concern such bonuses?  If so, what was the content of such decisions?

Response to Question 22):

Question 23):

Why did Article 2.4 of the contract of sale of shares of December 9, 2005, provide for the sale of

the "stock" of ANTIQUORUM SA?

Response to Question 23):

Question 24):

Were you involved within the framework of the contract of sale of shares or the "Consulting Agreement" of December 9, 2005 and, if so, in what manner?

Response to Question 24):




Question 25):

To date, have all the obligations set out in the contract of sale of shares of December 9, 2005 and the "Consulting Agreement" been fulfilled?

Response to Question 25):




Question 26):

Following the signing of the contract of sale of shares and the "Consulting Agreement" of December 9, 2005, did ANTIQUORUM SA write to Osvaldo PATRIZZI to inform him that it was not bound thereby and, if so, why did it write such a letter?

Response to Question 26):

Question 27):

Following the signing of the contract of sale of shares of December 9, 2005, did HABSBURG

HOLDINGS Ltd. transfer the shares to ARTIST HOUSE HOLDINGS Inc. and, if not, why did it

not transfer them?

Response to Question 27):


Question [28]):

What did the parties agree thereafter?

Response to Question 28):


Question [29]):

In January 2006, were the amounts of USD 4,500,000. - and subsequently USD 19'500'000.-

credited to your third-party receiver account?  If so, who paid those amounts and for what

reasons?

Response to Question [29]):

I declare under penalty of perjury that the information contained in this Execution Affidavit of Letter Rogatory is true and correct.

Dated: _____, New York
_____ \_\_\_\_, 2014

_____
Signature

_____
Print Name

Executed this \_\_\_ day of
_____, 2014

_____
Notary Public

-12-

C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x
IN RE:                                        :        *EX PARTE* ORDER
                                              :
LETTER ROGATORY FOR                           :        M 19-84
INTERNATIONAL JUDICIAL                        :
ASSISTANCE FROM THE COURT                     :
OF FIRST INSTANCE, REPUBLIC AND               :
CANTON OF GENEVA, SWITZERLAND,                :
IN THE MATTER OF ANTIQUORUM SA                :
v. OSVALDO PATRIZZI AND SIMON                 :
LEENDERT VERHOEVEN                            :
                                              :
-----------------------------------------------------x

WHEREAS, the United States of America, by its attorney, Preet Bharara, United

States Attorney for the Southern District of New York, on behalf of the Court of First Instance,

Republic and Canton of Geneva, Switzerland, is seeking to obtain information from Michael

Levine in Scarsdale, New York, for use in connection with a judicial proceeding pending in that

court captioned "Antiquorum SA v. Osvaldo Patrizzi and Simon Leendert Verhoeven";

NOW THEREFORE, it is hereby ORDERED, pursuant to 28 U.S.C. § 1782(a)

and Rule 28(a) of the Federal Rules of Civil Procedure, that Louis A. Pellegrino, Assistant

United States Attorney, Southern District of New York, be and hereby is appointed as

Commissioner, to take such lawful steps as are necessary to obtain information from Michael

Levine and to submit said information to the United States Attorney for the Southern District of

New York for transmission to the United States Department of Justice or its designee.

IT IS FURTHER ORDERED that the United States Attorney's Office shall serve

Michael Levine with a copy of this Order and the accompanying documents.

Dated: New York, New York
        September ____, 2014


                                          _____
                                          UNITED STATES DISTRICT JUDGE